UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
)
KATHLEEN FREDERICKS )    Civil Action No.
)
individually and on behalf of all )
others similarly situated )
)
Plaintiff, )
)
v. )
)
AMERIFLIGHT, LLC )
)
)
)
Defendant. )
_____)

## CLASS ACTION COMPLAINT

1.     It is a bedrock principle of the American labor market that employers pay employees to work for them, and that employers are responsible for the costs of doing business—not the other way around. Being paid for their work is how employees earn a living. In exchange, employers receive the benefit of employees' labor. Employees are not charged for the opportunity to do their jobs.

2.     Ameriflight, a cargo airline based out of Dallas, Texas, has attempted to turn this basic tenet on its head by requiring all new pilot hires to sign a training repayment agreement provision ("TRAP") that charges pilots between $20,000 and $30,000 if they dare to leave Ameriflight before giving Ameriflight 18 to 24 months of their work, or even under some circumstances if Ameriflight fires them before they've served out their full 18- to 24-month "term."

3.      Ameriflight tells employees that these charges are necessary to reimburse it for the training that it provides to pilots. But this training is not for pilots' benefit. Rather, it is for Ameriflight's own benefit.

4.      Another bedrock principle of the American labor market and Texas law—which is the state law Ameriflight selected to govern its TRAP—is that employers must compete for workers through wages and benefits, and not by unreasonably restraining their workers' right to seek out better opportunities.

5.      But the TRAP turns that principle on its head too. The effect, and the intent, of the TRAP is to penalize pilots who seek out other opportunities and to keep pilots stuck in their jobs despite Ameriflight's below-market wages and working conditions. This violates state and federal law, undermines pilots' bargaining power, and deprives other employers of qualified pilots at a moment when airlines and customers are suffering from a pilot shortage.

6.      Plaintiff Kathleen Fredericks, individually and on behalf of all others similarly situated, seeks to hold Ameriflight accountable for its conduct and seeks all available damages, remedies, and penalties under the Fair Labor Standards Act, 29 U.S.C. § 216; Texas Business & Commercial Code § 15.05; and Texas common law prohibiting unenforceable penalties.

## **PARTIES**

7.      Ameriflight is a privately-held corporation and subsidiary of Pebbles Aviation LLC, an investment group located in Sarasota, Florida. Ameriflight's principal place of business is in Dallas, Texas.

8.      Plaintiff Kathleen Fredericks was employed by Ameriflight from approximately May to December 2021 and resided in Puerto Rico during this time.

9. At all times relevant to this action, Ameriflight was an enterprise engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r)–(s).

10. Upon information and belief, Ameriflight had gross sales made or business done in excess of $500,000 annually for each of the years from 2020 through 2022.

11. Throughout her employment, Ameriflight was an "employer" of Fredericks as defined by the FLSA.

12. Throughout her employment, Fredericks was a non-exempt "employee" of Ameriflight as defined by the FLSA.

13. Throughout her employment, Ameriflight "employed" Fredericks within the meaning of the FLSA.

## JURISDICTION & VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(d), and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. This Court has personal jurisdiction over the parties because Defendant transacts business in, and this action arose from transactions conducted in, the territory of Puerto Rico.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this claim arose from transactions conducted in this territory.

## STATEMENT OF FACTS

### I. Ameriflight's Fleet and Hiring Requirements

16. Ameriflight is a national cargo airline with bases in Spokane, WA; Portland, OR; Burbank and Ontario, CA; Phoenix, AZ; Omaha, NE; Dallas, San Antonio, and El Paso, TX; Lansing, MI; Cincinnati, OH; Manchester, NH; and Borinquen and San Juan, PR.

17.     Ameriflight owns and operates a fleet of approximately 156 airplanes consisting of four models. These include 41 Fairchild SA-227 Metroliners, 13 Embraer EMB-120 Brasilias, 25 Beechcraft 1900s, and 52 Beechcraft 99s. All of Ameriflight's airplanes are twin-engine turbopropellers that have been out of production for at least 20 years.

  a.  The Metroliner, of which Ameriflight is currently the largest operator, was manufactured between 1968 and 2001.

  b.   The Brasilia, of which Ameriflight is currently the largest civilian operator, was manufactured between 1983 and 2001.

  c.  The Beechcraft 1900 was manufactured between 1982 and 2002.

  d.  The Beechcraft 99 was manufactured between 1966 and 1987. More than half of all Beechcraft 99 planes that remain in service are operated by Ameriflight.

18.     Because Ameriflight's fleet is made up of airplanes that are, at a minimum, more than two decades old, maintenance is a consistent issue, and Ameriflight has received several citations from the Federal Aviation Administration (FAA) over the years.

19.     In order to qualify for hire, all Ameriflight pilots must hold either a commercial pilot certificate with a multi-engine land and instrument rating or an Airline Transport Pilot Certificate. The company also requires a minimum of 500 hours of flying time for First Officer hires and a minimum of 1,200 hours of flying time for Captain hires, as well as minimum requirements for specific types of flight experience, including a certain amount of time flying multi-engine aircraft, flying cross-country, flying at night, and flying as a pilot-in-command.

20.     In other words, pilots must come to Ameriflight with numerous existing certifications or credentials. All these certifications require substantial experience, which pilots

must obtain before coming to Ameriflight. To earn a commercial pilot certificate, pilots must first earn a private pilot certificate, an Instrument Rating, and a Commercial Multiengine Land certificate. A commercial pilot certificate requires 250 hours of flight experience, including a specific amount of time flying cross-country and as a pilot-in-command, along with instrument training and experience flying a complex aircraft.

21.     Pilots with a commercial pilot certificate are permitted to fly certain commercial planes without any additional certification or licensure. These planes include planes that weigh under 12,500 pounds and are powered by propellors. One of Ameriflight's aircraft—the Beechcraft 99—falls into this category.

22.     In order to captain commercial aircraft that weigh over 12,500 pounds, any airplane with a jet engine, and certain other aircraft as designated by the FAA, pilots must achieve what is called a "type rating" in addition to their commercial pilot certificate.[1] A type rating is an additional certification, beyond a commercial pilot's certificate, that allows pilots to captain a specific make and model of an aircraft. For example, a pilot who wants to captain an Airbus A320 must receive an Airbus type rating that encompasses the A319, A320, A321 aircraft types. Three of the planes in Ameriflight's fleet fall into this category: the Beechcraft 1900, Metroliner, and Brasilia are all type-rated aircraft because of how much they weigh.

## II.    Ameriflight's Operating Requirements

23.     Ameriflight advertises itself as the largest Part 135 cargo airline in the country. Part 135 refers to 14 C.F.R. Part 135, an aviation regulation that applies to operators of charter planes

---

[1] The FAA does not typically require First Officers to be type-rated. However, a second-in-command (SIC) type rating is available under FAA regulations because First Officers may need a type rating in order to fly in some international airspace.

5

in interstate, foreign, or overseas transportation or carrying mail and that have 30 or fewer seats or a maximum payload capacity of 7,500 pounds.

24.     Holders of Part 135 certification, including Ameriflight, must meet specific requirements for equipment, facilities, personnel, manuals and programs. These requirements include that the operator submit a completed training curriculum as part of its Part 135 application letter, including:

- Basic indoctrination training

- Emergency training

- Crew resource management (CRM) training

- Initial ground and flight training

- Upgrade ground and flight training

- Recurrent ground and flight training

- Requalification training

- Differences ground and flight training

- Transition ground and flight training

- Hazardous material (hazmat) training

25.     FAA regulations require Part 135 operators to have all newly-hired pilots undergo the training curriculum for the airplane they were hired to fly, regardless of whether the pilots already have the certifications they would need in order to fly independently of the operator, and regardless of their prior experience.

26.     Part 135 certification is required of airline operators, not of specific pilots. In other words, the Part 135 training is for the benefit of the airline operator (so that they can maintain the proper certification) rather than for the benefit of the pilots (who do not necessarily receive

6

transferrable certification or credentialing as a result of the training they receive). Pilots may receive a type rating as part of the Part 135 training process, but only if the aircraft is type-rated.

### III.  Pilot Training Provided to New Hires at Ameriflight

27.     Part 135 training for pilots at Ameriflight proceeds in four parts. Ameriflight estimates that this training will take a total of five weeks, although in some cases it takes significantly longer, as trainer staffing issues and limited equipment may leave pilots waiting for training spots for weeks or even months.

28.     For approximately one week, new hire pilots receive indoctrination training, which is classroom training on Ameriflight policies and procedures, as well as operational specifications, hazardous materials training, and an overview of FAA regulations. Indoctrination (or "indoc") is the same for all new Ameriflight pilots, regardless of the kind of airplane they fly. After the weeklong indoc training, new hires take an open-book pass-fail written test in order to proceed to the next steps of the training program.

29.     The second week of training involves ground school systems training, where new pilot hires learn the airplane's systems and flight limitations, including for example takeoff weight, airspeed, and performance in various weather conditions.

30.     This ground school systems training is specific to the type of aircraft the pilot has been hired to fly. For Beechcraft 99 pilots, it takes place at Ameriflight's headquarters. For the remaining aircraft, the training takes place at third-party simulator training facilities. Although Ameriflight uses third-party facilities, Ameriflight's ground school systems training is not provided to the public. Rather, the training takes place in classes comprised only of Ameriflight pilots and taught by instructors using Ameriflight's curriculum.

31.     Once trainees have completed ground school systems training, they proceed to a flight simulator. There are various kinds of flight simulators that provide different levels of realism

in the flight simulation experience. At the more basic level, flight simulators known as flight training devices (FTD) run software that imitates flight functions in a structure that imitates the cockpit of a functioning aircraft. More expensive and sophisticated flight simulators known as full-flight simulators also imitate the movement, aerodynamics, and handling of specific aircraft.

32.    For Beechcraft 99 training, Ameriflight uses a static FTD located in-house at its Dallas headquarters that runs on software from the 1990s. This software is slow and glitchy, but no updates are available, as the Beechcraft 99 has been discontinued for decades.

33.    Upon information and belief, Ameriflight's FTD is over two decades old, and it costs Ameriflight nothing to allow its pilots to use this static FTD.

34.    For training on other aircrafts, such as the Metroliner, full-flight simulators are available for Ameriflight's use via FlightSafety, but a significant portion of training nevertheless takes place on static simulators.

35.    Pilots are supposed to complete multiple sessions on the simulator for their aircraft, as required by Part 135 of the FAA. This may take as little as two weeks or as many as several weeks, depending on staffing and access.

36.    Following simulator training, pilots go to one of Ameriflight's bases around the country and begin Initial Operating Experience ("IOE") flying. In an IOE flight, the pilot flies with a training captain in the plane with them. A small portion of IOE flying may take place without cargo, but the vast majority of flying time takes place on flights transporting cargo for Ameriflight customers. These types of flights are known as "revenue flights." Ameriflight charges customers for IOE flights at the same rate it charges them for other flights.

37.    Throughout training, pilots are considered Ameriflight employees, and earn $12.50 per hour. Once they have completed training, they make their regular salary, which starts as low as approximately $30,000 per year.

38.    Ameriflight claims that its training is worth $20,000 to $30,000, but this is a gross overvaluation. Training is staffed by Ameriflight employees, involves simulators that are relatively inexpensive (or even free), and consists in large part of pilots taking flights that Ameriflight earns revenue for.

39.    Ameriflight could easily calculate and provide the actual cost of the training to the pilots who undergo it, but it does not do so.

40.    Moreover, for Beechcraft 99 pilots, Ameriflight's training does not provide any sort of credential that is transferrable to another employer. That's because Part 135 training is tied to a specific employer and the Beechcraft 99 does not require a type rating to fly. Beechcraft 99 pilots come to Ameriflight with all of the licensing and credentialing they need to fly this aircraft.

41.    Although pilots for the Beechcraft 1900, the Metroliner, and the Brasilia do receive type ratings through their training from Ameriflight, these type ratings are of extremely limited use given that these planes are outdated and that Ameriflight is one of the only airlines that still uses them. In other words, while this credential is theoretically transferable, in practice it does little to benefit the pilot outside of their employment with Ameriflight, and its primary goal is to satisfy Ameriflight's obligations under Part 135.

42.    The second-in-command type rating received by First Officer pilots is even less useful, because, with the exception of the Brasilia (the E120), this type rating is not required for First Officers flying within the United States.

43.     Furthermore, even a type-rated pilot who transferred to a different Part 135 operator would have to repeat most of the Part 135 training that they received from Ameriflight—the training that gave them the type rating—because that training is a requirement for the airline to operate and not for the individual pilots.

### IV.     Training Repayment Agreement Provision

44.     Beginning in approximately spring 2020 and ending in spring 2022, Ameriflight required all new pilot hires to sign a Training and Employment Agreement upon commencement of their employment with Ameriflight. This provision is hereinafter referred to as the Training Repayment Agreement Provision, or TRAP.

45.     The TRAP required new pilot hires to confirm that they had "all necessary ratings and qualifications and the intention to become employed by Ameriflight."

46.     The TRAP also stated that new pilot hires would be required to "undergo FAA Part 135 regulated Ameriflight training," and that the costs of this training "are a significant investment undertaken by Ameriflight of time, resources, and expense."

47.     Under the heading "Training," the TRAP provided:

Ameriflight will provide initial training of . . . Pilot . . . (the "Training"). Training will include e-learning, ground/indoctrination class, flight training, Simulator sessions, FAR 135 check ride, and initial operating experience (IOE) flights with a qualified captain. All training expenses will be paid initially by Ameriflight, subject to repayment by the Pilot under the terms and conditions of this agreement.

48.     Under the heading "Repayment of Training Expenses," the TRAP required new pilot hires to pay a total penalty of $20,000 or $30,000 if the pilot "resigns employment or is terminated by Ameriflight for cause" before they complete either 18 or 24 months of "revenue flying" for Ameriflight.

49.     The TRAP did not define revenue flying, but its common definition refers to flights chartered by paying customers. In practice, however, Ameriflight has refused to consider the contract term completed until 18 or 24 months after a pilot completed IOE, which was generally several weeks or more after the pilot began to fly revenue flights.

50.     Some agreements included a provision that prorated the amount pilots would owe by half if they left the company more than a year after the commencement of revenue flying, while some did not.

51.     The TRAP included a Texas choice of law provision, but did not include a venue provision.

52.     The TRAP is an unreasonable restraint of trade, with no geographical limitations or limitations on the scope of the activity to be restrained. The TRAP imposes a serious financial burden on pilots who wish to leave Ameriflight, whether they are doing so to work for a competitor, to move to another state or country, or to change careers entirely. It is not reasonably tailored to maintaining Ameriflight's goodwill or other business interests. Rather, it is designed to punish employees for exercising their right to seek better or even simply different terms of employment elsewhere.

53.     In addition, the amount of money Ameriflight charges employees for leaving their jobs is not a reasonable forecast of just compensation for the training they receive. The valuation for training is arbitrary and inflated, and fails to take into account that for a significant part of the training Ameriflight is in fact earning money from customers for the pilots' work.

54.     Ameriflight consistently fails to provide pilots who request it with an accounting of the actual cost of the training, although upon information and belief Ameriflight should be able to track training costs and calculate them precisely upon an employee's departure.

**V.     Collections Efforts**

55.     During the relevant time period, pilots who left their jobs at Ameriflight within two years of completing IOE received a letter from Ameriflight Human Resources Manager Scott Macduff requesting payment of the outstanding TRAP amount. This letter requested full repayment within 30 days.

56.     The letter stated that failure to repay the TRAP amount within 30 days would result in the pilot being ineligible for rehire and Ameriflight sending the outstanding debt to collections or pursuing legal action to recover the amount due.

57.     Upon receipt of this letter, some pilots paid the full amount of the debt directly to Ameriflight, while others negotiated payment directly to Ameriflight in monthly installments. Pilots who refused to pay had their debts sent to collections agency IC Systems.

**VI.     Kathleen Fredericks**

58.     Plaintiff Kathleen Fredericks began working as a pilot in Puerto Rico in February 2021 for a non-Ameriflight Part 135 operator based on the island. Three months later, in April 2021, Ameriflight contacted her with an immediate opening at the San Juan base, and she was given less than 24 hours to accept the offer. Fredericks accepted, and started working as a Beechcraft 99 pilot for Ameriflight on May 10, 2021.

59.     At the time Ameriflight hired her, Fredericks had attended multiple flight schools, had approximately 1700 hours of previous flight experience, and had multiple certificates, including an Airline Transport Pilot (ATP) certificate, which collectively represented more hours and a higher certification level than were required for the Ameriflight job. Because she was flying a Beechcraft 99, Fredericks did not require any additional accreditation.

60.     After she received the offer of employment from Ameriflight, Fredericks received an employment package, including an employment agreement, by email, and an Ameriflight

representative told her to sign it and send it back. No Ameriflight representative mentioned or explained the TRAP. Fredericks signed the agreement.

61.     The employment agreement Fredericks signed contained a TRAP, which stated that Ameriflight would seek payment from Fredericks in the amount of $20,000 if she left before completing 12 months of revenue flying, or $10,000 if she left between 12 and 18 months of revenue flying.

62.     For the entirety of her employment with Ameriflight, from May 2021 until December 2021, including for much of her training, Fredericks was based out of San Juan, Puerto Rico.

63.     Fredericks had to undergo Part 135 training to fly the Beechcraft 99 because it is federally required of cargo airlines. Fredericks' "indoc" training lasted one week, starting May 10, 2021, in Dallas, Texas. Subsequently, Ameriflight required her to do two weeks of training in Dallas on the stationary Flight Training Device that Ameriflight owns and operates. The equipment was outdated and in poor condition and was not approved by the FAA as a loggable Flight Simulator. After this, Fredericks passed the Visual Competency Check, which is an in-flight skills test, flying out of Salt Lake City, Utah. During this stage of her training, Ameriflight classified Fredericks as an employee and paid Fredericks $100 a day, with an additional $30 daily food stipend.

64.     Fredericks returned to Puerto Rico to complete her training by flying with a training captain on revenue flights. This took two weeks, and she completed her check ride, the final step of training, in July 2021. A check ride is a practical flying test performed by an FAA representative.

65.     Fredericks did not receive a type rating from the training.

66.     Fredericks' gross annual salary at Ameriflight, starting in July 2021 when she was designated a Pilot in Command, was approximately $55,000. Repayment of the $20,000 TRAP would therefore require Fredericks to return to Ameriflight a substantial portion of her annual income.

67.     On November 19, 2021, Fredericks submitted her resignation due to factors that included a grueling schedule and a non-competitive salary as compared to other airlines. The resignation email was sent to Ameriflight Chief Pilot Chris Adams, copying Scott Macduff (head of Human Resources), Javier Vanchier (SJU Airport Base Manager), and Alberto Calvo (Caribbean Region Chief Pilot).

68.     Fredericks knew from fellow pilots that Ameriflight had been aggressive in trying to collect on employees' TRAP debt. Therefore, in her resignation email, Fredericks asked Adams for an itemized list accounting for the supposed $20,000 cost of training. She did not receive any such accounting. Adams responded generally that the TRAP was "for the specific cost of our training program" but did not provide any details about that cost.

69.     In subsequent email exchanges with Macduff, Fredericks agreed to pay Ameriflight $250 a month toward the TRAP. She entered into the agreement because she was concerned that Ameriflight or a debt collector could sue her in court, or that Ameriflight would retaliate and give her a negative review in the Pilot Records Database, a database of pilot training records submitted by previous employers, which is available for all airlines to verify before they make a hiring decision.

70.     Since January 1, 2022, Fredericks has made payments each month, totaling approximately $3,250 as of January 2023. This is a significant expense in her life, preventing her from saving money towards a down payment for a home or other life expenses.

14

71.     During her last full pay period of work—which accounted for two full weeks of work—Fredericks was paid approximately $2,500 for around 95 hours of work. For her last full week of work, she was paid no more than $1,300. Subtracting payments she has made to Ameriflight, she did not earn anything at all in her last work week. To date, she has paid Ameriflight thousands of dollars to work for it.

72.     Fredericks has suffered an injury in fact and has lost money or property as a result of the TRAP.

73.     Fredericks has suffered emotional distress because of the TRAP debt.

## **CLASS ACTION ALLEGATIONS**

74.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

75.     Plaintiff asserts claims on behalf of and seeks to represent a Class of all pilots subject to Ameriflight's Training Repayment Agreement Provision within the statute of limitations.

76.     Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

77.     **Numerosity**: The Class is so numerous that joinder of all class members is impracticable. During the relevant period, Ameriflight has employed well over 100 pilots across the United States who were subjected to its TRAP. Although the precise number of putative Class members is currently unknown, these members can be easily identified based on Defendant's records.

78.     **Commonality**: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

      a.   whether Ameriflight's TRAP is an illegal kickback on wages;

      b.   whether the training is primarily for Ameriflight's benefit;

      c.   whether pilots' wages were paid free and clear;

      d.   whether Ameriflight's TRAP is an unlawful contract in restraint of trade;

      e.   whether Ameriflight's TRAP operates as an invalid liquidated damages provision; and

      f.   the proper measure of damages and/or other forms of relief.

79.     These common questions arise, in part, because of the uniform circumstances under which Plaintiff and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued.

80.     **Typicality**: Plaintiff's claims are typical of the members of the Class because Plaintiff was subject to and harmed by Ameriflight's standard TRAP contract within the statute of limitations, and Ameriflight treated her consistently with other class members in accordance with its standard policies and procedures.

81.     **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the prosecution of this action and has retained counsel with extensive experience in class actions, including class actions involving TRAPs. There are no conflicts between Plaintiff or Plaintiff's counsel and the Class Plaintiff seeks to represent.

82.    **Predominance and Superiority**: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Ameriflight uses a contract that is uniform as to all relevant terms, and promulgates uniform policies and practices that result in common violations of law. Declaratory, equitable, and injunctive relief are appropriate with respect to Plaintiff and members of the Class as a whole. Joinder of all members of the Class is impracticable, and class certification will promote efficiency by eliminating the complication and expense of duplicative litigation that might overwhelm the courts and result in inconsistent judgments concerning Defendant's practices. Use of the class mechanism will foster economies of time, effort, and expense and ensure uniformity of decisions.

## COLLECTIVE ACTION ALLEGATIONS

83.    Pursuant to the collective action provision of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), Plaintiff Fredericks seeks to represent an FLSA Collective consisting of all pilots employed by Defendant who are or were subject to the TRAP and file a consent form to join this action.

84.    The proposed FLSA Collective members are similarly situated in that they have been subject to uniform policies and practices by Defendant that violated the FLSA, including Defendant's TRAP and post-employment collections conduct.

## COUNT I: FAIR LABOR STANDARDS ACT (Illegal Kickback)

## 29 U.S.C. § 216

**(Plaintiff on behalf of herself and the Collective against Defendant)**

85.    Plaintiff incorporates by reference all previous paragraphs of this Complaint.

86.    Defendant was Plaintiff's employer pursuant to the Fair Labor Standards Act.

87.     Plaintiff was an employee pursuant to the Fair Labor Standards Act.

88.     Repayment of alleged training costs under the TRAP that Defendant has imposed on Plaintiff and others similarly situated is an illegal kickback of wages to Defendant, because the training was primarily for Defendant's benefit.

89.      Kicking back these training costs to Defendant takes employees' wages below minimum wage in their final week of work, resulting in a minimum wage violation for that week.

90.     Plaintiff was not paid at least the minimum wage for all hours worked in her final week of work, because she was required to kick back those wages to Defendants under the TRAP.

91.     Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

92.     Plaintiff and others similarly situated are entitled to recover unpaid minimum wages plus an additional equal amount in liquidated damages and declaratory relief that the purported costs of the debt are not reimbursable pursuant to the FLSA, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT II: FAIR LABOR STANDARDS ACT (Wages Not Paid Free and Clear)

## 29 U.S.C. § 216

**(Plaintiff on behalf of herself and the Collective against Defendant)**

93.     Plaintiff incorporates by reference all previous paragraphs of this Complaint.

94.     Defendant was Plaintiff's employer pursuant to the Fair Labor Standards Act.

95.     Plaintiff was an employee pursuant to the Fair Labor Standards Act.

96.     Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff and others similarly situated to repay between $20,000 and $30,000 of their earned and taxed wages to Defendant once their employment with Defendant ended (including under some circumstances if Defendant chose to fire them).

18

97.     Rather than paying Plaintiff and other similarly situated employees their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs. If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

98.     By requiring Plaintiff and other similarly situated employees to return their wages to Defendant if they left their jobs, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

99.     Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked free and clear.

100.    Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

101.    Plaintiff and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT III: UNLAWFUL CONTRACT IN RESTRAINT OF TRADE

### Texas Business & Commercial Code § 15.05 et seq.

### (Plaintiff on behalf of herself and the Class against Defendant)

102.    Plaintiff incorporates by reference all previous paragraphs of this Complaint.

103.    The Texas Business and Commercial Code §15.05 et seq. prohibits every "contract, combination, or conspiracy in restraint of trade."

104.    A clear purpose and effect of the TRAP is to limit pilot mobility. It explicitly punishes pilots who try to work somewhere other than Ameriflight with a severe economic penalty. That means it must be analyzed as a "restraint of trade" under Tex. Bus. Comm. Code § 15.05 et seq.

105.    There is only one exception to this prohibition on restraints of trade under Texas law.  Certain "covenants not to compete" can be lawful, but only if they meet two requirements:

    a)  The covenant not to compete must be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made," and

    b)  It must contain "limitations as to time, geographical area, and scope of activity to be restrained" that are "reasonable," and that "do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee."

Texas Business and Commercial Code § 15.50.

106.    Ameriflight's TRAP is not ancillary to another enforceable agreement.

107.    Ameriflight's TRAP also contains no limitations as to the time, geographical area, or scope of activity that it restricts. That's because it applies no matter where Ameriflight employees go following their employment with Ameriflight, or when, and regardless of what their subsequent employment entails, or whether they are subsequently employed at all.

108.    The TRAP imposes a severe economic penalty on departing employees that does not protect any legitimate competitive interest of Ameriflight. It injures pilots by subjecting them to debts that can exceed half of their yearly salary with Ameriflight, and injures the public by limiting the choice and mobility of skilled employees.

109.    As a result, Ameriflight's TRAP does not fall within the "covenant not to compete" exception in Tex. Bus. Comm. Code § 15.50.  It is a blatant restraint of trade, not subject to any statutory exceptions, and it is therefore unlawful under Tex. Bus. Comm. Code § 15.05.

110.    Plaintiff and the Class seek a declaration under Tex. Bus. and Comm. Code § 15.21 that the Ameriflight TRAP is an unlawful restraint of trade under Texas law.

111.    In addition, Plaintiff and the Class seek an injunction under Tex. Bus. Comm. Code § 15.21: (a) prohibiting Ameriflight from taking any further actions to collect on or enforce its TRAP; (b) prohibiting Ameriflight from referring any further cases to a collections agency; (c) prohibiting Ameriflight from reporting this invalid debt to any collections agencies; and (d) requiring Ameriflight to take appropriate steps to repair the damage done to the credit ratings of the Class members, such as a goodwill deletion agreement.

112.    In addition, Plaintiff and the Class seek to recover actual damages sustained (including but not limited to the monies that they have paid to Ameriflight, or to any collections agency on Ameriflight's behalf, under the TRAP), interest on actual damages for the period beginning on the date of service of this Complaint and ending on the date of judgment, and the cost of suit, including a reasonable attorney's fee.

113.    Ameriflight's conduct was willful or flagrant, as it has previously been put on notice that its TRAP, and its enforcement actions, are unlawful. But it continues to force its ex-pilots to return their lawfully earned wages and taxes them if their employment with Ameriflight ends before their "term" is served.  Plaintiff and the Class therefore seek recovery of threefold the damages sustained and the cost of suit, including a reasonable attorney's fee.

## COUNT IV: UNENFORCEABLE PENALTY

### Unlawful Liquidated Damages Provision

21

**(Plaintiff on behalf of herself and the Class against Defendant)**

114.    Plaintiff incorporates by reference all previous paragraphs of this Complaint.

115.    Liquidated damages clauses for breach of contract are only legal under Texas law (1) if the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. Liquidated damages clauses that do not meet both of these requirements are considered to be unenforceable penalties.

116.    The TRAP is an unenforceable penalty. The harm caused by pilots who leave Ameriflight before the end of the two-year TRAP term is not incapable or difficult of estimation, and the amount of liquidated damages Ameriflight charges departing pilots is not a reasonable forecast of just compensation.

117.    Plaintiff and the Class have been harmed by this unlawful penalty, as set forth above. They seek a declaration under the Texas Uniform Declaratory Judgments Act (Civ. Prac. Rem. Code Ch. 37) that the TRAP is unlawful and unenforceable against them, as well as costs and reasonable and necessary attorney's fees, and the following supplemental relief under Tex. Civ. Prac. Rem. Code 37.011: (a) an award equal to actual damages sustained (including but not limited to the monies that the Class have paid to Ameriflight, or to any collections agency on Ameriflight's behalf, under the TRAP); and (b) injunctive relief.

**PRAYER FOR RELIEF**

118.    Plaintiff respectfully requests that the Court:

a.    Certify the case as a class action on behalf of the proposed class;

b.    Designate Plaintiff as a class representative;

c.    Designate Plaintiff's counsel of record as class counsel;

d.    Certify the case as a collective action on behalf of the proposed collective;

e.      Declare that Defendant's conduct is illegal under the various statutes cited here;

f.      Preliminarily and permanently enjoin Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

g.      Award Plaintiff damages, including treble damages, and equitable relief, including restitution and disgorgement, in an amount subject to proof at trial;

h.      Award Plaintiff's counsel costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

i.      Order pre-judgment and post-judgment interest as provided by law; and

j.      Provide such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: January 30, 2023              Respectfully submitted,

*/s/ Myriam E. Matos-Bermúdez*

Myriam E. Matos-Bermúdez
DTS LAW LLC
221 Ave Ponce de León Ste 801
San Juan, PR 00917-1804
Tel: (787) 754-8700

David Seligman (*pro hac vice* forthcoming)
david@towardsjustice.org
Rachel W. Dempsey (*pro hac vice* forthcoming)
rachel@towardsjustice.org
TOWARDS JUSTICE
PO Box 371680, PMB 44465
Denver, CO 80237-5680
Tel: (720) 441-2236

Persis Yu (*pro hac vice* forthcoming)
persis@protectborrowers.org
STUDENT BORROWER PROTECTION CENTER
(a fiscally sponsored project of Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
Tel: (202) 670-3871

Rachel Smit (*pro hac vice* forthcoming)
rachel@fairworklaw.com
FAIR WORK, P.C.
192 South St. Suite 450
Boston, MA 02111, USA
Tel: (617) 841-8188

Ashley Tremain (*pro hac vice* forthcoming)
ashley@tremainartaza.com
TREMAIN ARTAZA PLLC
4925 Greenville Ave Ste. 200
Dallas, TX 75206
Tel: (469) 573-0229

*Attorneys for Plaintiff and the Putative Class and Collective*